**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JENNY URBANIC, )
)
          Plaintiff, )
)
      v. )      Civil Action No. 11-805
)
PATRICK R. DONAHOE, in his Official )
Capacity as the Postmaster General of the )
United States Postal Service, )
)
          Defendant. )

## <u>MEMORANDUM OPINION</u>

Plaintiff Jenny Urbanic brought this employment discrimination claim against Defendant Patrick R. Donahoe, in his official capacity as the Postmaster General of the United States Postal Service ("USPS"), pursuant to the Age Discrimination in Employment Act ("ADEA") and 42 U.S.C. § 1983. (Docket No. 1). Ms. Urbanic contends that her supervisor Heidi L. Kelly retaliated against her for filing an internal age discrimination complaint by precipitating her termination from her position at the Portersville Post Office, which was later reduced to a term of suspension. *Id.* Plaintiff's § 1983 claim against Heidi L. Kelly, as an individual, was dismissed; therefore, only the ADEA retaliation claim against Defendant Donahoe remains. (Docket No. 13).

On December 17, 2012, Defendant filed the pending motion for summary judgment, seeking dismissal of the entirety of Plaintiff's claims on the merits. (Docket No. 34). Plaintiff submitted her response opposing summary judgment on January 14, 2013. (Docket No. 41). A hearing on this matter was later held on February 26, 2013.[1] (Docket No. 44). Subsequently, Plaintiff filed a supplemental brief clarifying that she "seeks damages stemming only from her

---

[1] The parties declined to order a transcript of the summary judgment hearing. (Docket No. 44).

suspension from September through December 2009."[2]  (Docket No. 45, at 1).  For the reasons given below, Defendant's motion is granted.

## I.  FACTUAL BACKGROUND

At all relevant times, Plaintiff was over the age of forty.  (Docket No. 36, at ¶ 2; Docket No. 42, at ¶ 2).  She was employed with the USPS in September 1995 as a rural carrier associate ("RCA").  (Docket No. 36, at ¶ 2; Docket No. 42, at ¶ 2).  She continued working as an RCA for six and a half years, part-time, assigned to the Fombell Post Office.  (Docket No. 36, at ¶ 3; Docket No. 42, at ¶ 3).  This job did not provide any benefits.  (Docket No. 36, at ¶ 3; Docket No. 42, at ¶ 3).  In December 2001, Plaintiff obtained a career position with the USPS as a part-time flexible ("PTF") clerk at the Postal Service Logistics and Distribution Center in Warrendale, PA.  (Docket No. 36, at ¶ 4; Docket No. 42, at ¶ 4).

As a PTF, Plaintiff was only guaranteed two hours of work every two weeks and was required to work as needed, including being available to work in neighboring Post Offices.  (Docket No. 36, at ¶ 5; Docket No. 39-2; Docket No. 42, at ¶ 5).  In March 2008, she became a PTF clerk assigned to the Portersville Post Office.  (Docket No. 36, at ¶ 6; Docket No. 42, at ¶ 6).  There were no full time clerks at Portersville, and Plaintiff was the only PTF clerk.  (Docket No. 36, at ¶ 6; Docket No. 42, at ¶ 6).

The Portersville Postmaster, Linda Jarrett, retired on December 31, 2008.  (Docket No. 36, at ¶ 7; Docket No. 42, at ¶ 7).  Heidi Kelly, a PTF clerk at the Slippery Rock Post Office, replaced Ms. Jarrett as the appointed "Official In Charge" ("OIC") at Portersville until a new

---

[2] Plaintiff's Complaint includes references to Ms. Kelly's role in reducing or eliminating her hours at the Portersville Post Office, denying her leave time, and recommending suspension for her failure to provide requested medical records.  (Docket No. 1, at ¶¶ 18-21, 24-28, 35-38).  Given Plaintiff's clarification, the Court finds that she is no longer pursuing her claims for damages as to these incidents.  Accordingly, summary judgment will be entered in favor of Defendant on these claims.  However, as is discussed below, the Court will consider evidence regarding the reduction or elimination of her hours at the Portersville Post Office to the extent that it may prove the decision to terminate her was motivated by retaliatory animus.

Postmaster was selected for the permanent position. (Docket No. 36, at ¶ 8; Docket No. 42, at ¶ 8). Ms. Kelly remained the OIC at Portersville from December 31, 2008 until May 3, 2010 when she was replaced by Alan Snyder, the newly appointed Postmaster of Portersville. (Docket No. 36, at ¶ 9; Docket No. 42, at ¶ 8).

During Plaintiff's time as the PTF Clerk at Portersville, she was generally scheduled to work two to four hours, Mondays through Fridays. (Docket No. 36, at ¶ 10; Docket No. 42, at ¶ 10). On Saturdays, the Postmaster did not work and Plaintiff typically worked for approximately five and a half hours as the Post Office Assistant ("POA"), a position for which she was compensated at a higher rate of pay. (Docket No. 36, at ¶ 10; Docket No. 42, at ¶ 10). She also worked additional hours at other nearby Post Offices. (Docket No. 36, at ¶ 10; Docket No. 42, at ¶ 10).

On June 15, 2009, Plaintiff contacted the Postal Service's EEO Office to initiate an EEO complaint alleging age discrimination pursuant to the ADEA. (Docket No. 36, at ¶ 11; Docket No. 42, at ¶ 11). This was her first involvement with the EEO process. (Docket No. 36, at ¶ 11; Docket No. 42, at ¶ 11). An EEO Counselor interviewed Plaintiff by phone on June 30, 2009. (Docket No. 36, at ¶ 12; Docket No. 39-3, at 4; Docket No. 42, at ¶ 12). During this interview, she agreed to mediation. (Docket No. 36, at ¶ 12; Docket No. 42, at ¶ 12). The mediation occurred on July 10, 2009 and was attended by Plaintiff, who was unrepresented, and by Ms. Kelly and Joe Scherder for the USPS. (Docket No. 36, at ¶ 12; Docket No. 39-3, at 4; Docket No. 42, at ¶ 12). No resolution was reached, but Plaintiff elected not to pursue the ADEA complaint any further. (Docket No. 36, at ¶ 13; Docket No. 42, at ¶ 13).

On August 21, 2009, Plaintiff told Ms. Kelly that she would "no longer accept higher level work" on the advice of the American Postal Workers Union ("APWU"); however, she

provided that she would work at her regular level seven rate. (Docket No. 39-7). After submitting this notice, Plaintiff was scheduled to work the following Saturday as the POA. (Docket No. 39-9, at 2). The APWU filed a Grievance on Plaintiff's behalf on September 14, 2009, alleging that she was paid at a lower level six rate on that date. (Docket No. 36, at ¶ 21; Docket No. 39-9, at 2; Docket No. 42, at ¶ 21). This Grievance was settled and she was paid an extra $25. (Docket No. 36, at ¶ 22; Docket No. 39-9, at 3; Docket No. 42, at ¶ 22). Ms. Kelly obtained a PTF clerk from another office to work at Portersville as the new POA. (Docket No. 36, at ¶ 23; Docket No. 42, at ¶ 23).

On September 7, 2009, Labor Day, Plaintiff was scheduled to work two hours on that day breaking down the mail. (Docket No. 36, at ¶ 24; Docket No. 43-1, at ¶ 12). After finishing her shift, she removed the labels she had made with her personal labeler from the distribution case. (Docket No. 36, at ¶ 24; Docket No. 39-10, at 8; Docket No. 43-1, at ¶¶ 14-16). Because the identifying labels from the distribution case were missing and because the mail had not been completely broken down, Ms. Kelly submitted a discipline request for Plaintiff's termination on September 16, 2009, which was reviewed and approved by supervisor Daniel Devey the next day. (Docket No. 39-10, at 4-7). The resulting Notice of Removal dated September 29, 2009 charged her with misconduct by: (1) failing to complete her assigned work, and (2) removing labels from the distribution case in order to cause difficulties for the new POA. (Docket No. 39-10, at 2). The Notice of Removal informed Plaintiff that her actions caused significant delays in the delivery of mail. *Id.* She was to be terminated effective November 1, 2009. *Id.*

On December 10, 2009, Plaintiff again contacted the Postal Service EEO Office to initiate another EEO complaint, alleging that she suffered from a hostile work environment, termination, and other adverse employment decisions in retaliation for her prior June 2009 EEO

complaint. (Docket No. 36, at ¶ 15; Docket No. 39-4, at 2; Docket No. 42, at ¶ 15). This complaint referenced both the APWU Grievance filed on September 14, 2009 as well as the Labor Day incident resulting in her termination. (Docket No. 39-4, at 4). In addition, Plaintiff complained that on June 30, 2009, Ms. Kelly allegedly told Plaintiff that her job was going to be eliminated in front of several rural carriers. (Docket No. 36, at ¶ 17; Docket No. 42, at ¶ 17). It was further represented that Ms. Kelly discussed this matter with others when Plaintiff was not present. (Docket No. 39-4, at 4). Plaintiff also alleged that Ms. Kelly was carrying out the threat of eliminating her job by changing the office hours and cutting her time there. *Id.* While Ms. Kelly told her that this was a cost-cutting measure affecting surrounding offices, *id.*, Plaintiff protested in the grievance that her work hours could not contractually be cut for budgetary reasons and pointed out that no other offices in the area had eliminated PTF clerk positions at that time. *Id.* at 4-5.

The APWU filed a Grievance pertaining to the termination action, resulting in another settlement on December 30, 2009, whereby the removal action was reduced to a two year Letter of Warning. (Docket No. 36, at ¶ 28; Docket No. 42, at ¶ 28). Plaintiff was reinstated to the PTF clerk position, but served a suspension from work from November 1, 2009 through December 30, 2009 and was not awarded any back pay. (Docket No. 36, at ¶¶ 28-29; Docket No. 39-14, at 6; Docket No. 42, at ¶¶ 28-29). She subsequently returned to work and was reassigned to the Portersville Post Office. (Docket No. 36, at ¶ 29; Docket No. 42, at ¶ 29).

By April 2010, Plaintiff was again accepting higher level pay, thereby allowing Ms. Kelly to schedule her as needed for POA duties at Portersville. (Docket No. 36, at ¶ 37; Docket No. 42, at ¶ 37). The Portersville PTF clerk position was eliminated in September 2010 and Plaintiff was transferred to the Wampum Post Office. (Docket No. 36, at ¶ 44; Docket No. 42, at

¶ 44).  She remains employed as a PTF clerk, but is generally only scheduled for the hours when the Post Master is not present.  (Docket No. 36, at ¶ 45; Docket No. 42, at ¶ 45).

## II.  LEGAL STANDARD

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact and that a judgment as a matter of law is warranted.  FED. R. CIV. P. 56(a).  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine dispute of material fact.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  As to materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" only if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party.  *Id.*; *accord Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (citation omitted).  Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof.  *Celotex Corp.*, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the nonmoving

party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine dispute of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

### III. DISCUSSION

The ADEA provides that it is unlawful to "discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Moreover, the anti-retaliation provision of the ADEA prohibits "an employer [from] discriminat[ing] against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted or participated in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). The burden shifting framework elaborated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is applied to analyze Plaintiff's claims under the ADEA. *See Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009) (noting the Third Circuit's practice of applying the *McDonnell Douglas* framework to ADEA claims) (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)); *Carlson v. Twp. of Lower Alloways Creek*, 452 F. App'x 95, 99-100 (3d Cir. 2011) (citing *Smith*).

Plaintiff has the initial burden to present evidence of a *prima facie* case of retaliation. *Moore v. City of Phila.*, 461 F.3d 331, 341-42 (3d Cir. 2006). To establish a *prima facie* claim for retaliation under ADEA, Plaintiff must show that: (1) she engaged in protected activities; (2) the employer took an adverse action against her; and (3) a causal link exists between the

employee's protected activity and the employer's adverse action. *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 508-09 (3d Cir. 2004) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000); *see also Carlson*, 452 F. App'x at 99 (citing *Glanzman*). With respect to the adverse action necessary to establish the *prima facie* case, the Supreme Court has specified that a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which … means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citations omitted); *see also Swain v. City of Vineland*, 457 F. App'x 107, 111 (3d Cir. 2012) (citing *Burlington Northern*); *Dreshman v. Henry Clay Villa*, 733 F. Supp. 2d 597, 617 (W.D. Pa. 2010) (Fischer, J.) (applying the "materially adverse" standard in an ADEA retaliation case) (citations omitted). If Plaintiff establishes a *prima facie* case, the burden shifts to Defendant "to advance a legitimate, non-retaliatory reason" for its employment decision and, if successful, the burden shifts back to Plaintiff to present sufficient evidence from which a reasonable jury could conclude that the employment decision was a pretext for retaliation. *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir.1997)).

### A. Plaintiff's Prima Facie Case

It is undisputed that Plaintiff filed an EEO complaint alleging age discrimination on June 15, 2009. (Docket No. 36, at ¶ 11; Docket No. 42, at ¶ 11). Although Defendant emphasizes the informality of the complaint and dispute resolution process, (Docket No. 35, at 4 & n.2), the ADEA makes no distinction between formal and informal charges of age discrimination. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (explaining that formal and informal charges of discrimination constitute protected conduct within the meaning of the

ADEA's anti-retaliation provision). Therefore, Plaintiff has shown that she engaged in a protected activity. There is also no question that the termination decision constitutes a materially adverse action. *Johnson v. McGraw-Hill Companies*, 451 F. Supp. 2d 681, 711 (W.D. Pa. 2006) (McVerry, J.) (observing that "a retaliatory discharge on the part of an employer would constitute a 'materially adverse' act of retaliation under *Burlington Northern*"). Thus, the only remaining question is whether there is a causal link between the Plaintiff's filing of the EEO complaint on June 15, 2009, Ms. Kelly's request for Plaintiff's termination three months later on September 16, 2009, and the notice of removal that was sent on September 29, 2009.

In order to show causation, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The Third Circuit has recognized that a three-month gap between the protected activity and the adverse action cannot, without more, create an inference of causation for summary judgment purposes. *LeBoon v. Lancaster Jewish Community Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (citing *Clark Cnty. Sch. Dist.*, 532 U.S. 268, 273 (2001)). Where there is a lack of temporal proximity, the Third Circuit permits the use of "circumstantial evidence of a 'pattern of antagonism' following the protected conduct" to raise an inference of causation. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (quoting *Robinson v. Southwestern Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993)). Furthermore, "the proferred evidence, looked at as a whole, may suffice to raise the inference" to establish causation. *Id.* (citation omitted); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (types of evidence probative of the causal link include "timing and

demonstrative proof, such as actual antagonistic conduct or animus" as well as "other evidence gleaned from the record as a whole from which causation can be inferred").

The record shows that there was animus and antagonism between Plaintiff and Ms. Kelly from the date of the filing of the EEO complaint and the date of the materially adverse action. The first alleged instance of antagonism—Ms. Kelly's threat on June 30, 2009 that Plaintiff's job would be eliminated—occurred two weeks after she filed her initial EEO complaint for age discrimination and on the same day she spoke to her EEO counselor. Following the EEO complaint and failed mediation, Plaintiff alleges that Ms. Kelly became hostile towards her and created a hostile work environment during their time together. These generally unpleasant interactions typically consisted of verbal altercations between the two in front of co-workers and customers. (Docket No. 43-1, at ¶¶ 6-9). Linda Grant, Du Wayne Flinner, and Darlene Strawhecker, RCAs at the Portersville Post Office, all confirm that Plaintiff and Ms. Kelly did not get along. (Docket No. 43-2, at 3; Docket No. 43-3, at 3; Docket No. 43-4, at 3). Specifically, Ms. Grant recounted that Ms. Kelly would refuse to answer questions from Plaintiff and that their raucous arguments made her want to leave the office. (Docket No. 43-2, at 3). Mr. Flinner stated that Ms. Kelly insisted on doing things her own way and that she abused her authority when dealing with Plaintiff. (Docket No. 43-3, at 2). Ms. Strawhecker also described Ms. Kelly as "often domineering" and prone to mood swings. (Docket No. 43-4, at 2). She further observed Ms. Kelly being rude, loud, and using an accusatory voice when speaking to Plaintiff. *Id.* In addition, Ms. Strawhecker overheard Ms. Kelly telling Plaintiff that nobody from the other post offices liked her and that they were glad when she left. *Id.* at 3. Plaintiff contends that Ms. Kelly's behavior was indicative of a continuing pattern of antagonism against her. (Docket No. 41, at 4).

In addition to the ongoing verbal exchanges, Plaintiff also alleges Ms. Kelly took affirmative steps to marginalize her role in the Portersville Post Office. Besides telling her that her job would be eliminated, Ms. Kelly also proceeded to reduce Plaintiff's "bargaining hours" from twenty-five per week to fifteen per week. (Docket No. 1, at ¶¶ 18-21; Docket No. 36, at ¶ 17; Docket No. 42, at ¶ 17; Docket No. 43-1, at ¶ 3). As Plaintiff explained during her deposition, her "bargaining hours" were the hours she worked at the Portersville office. (Docket No. 39-1, at 12-13; Docket No. 43-1, at ¶ 23). She claims that by August 21, 2009, her bargaining hours were completely eliminated. (Docket No. 1, at ¶ 21). Plaintiff further alleged that Ms. Kelly improperly permitted a carrier to break down mail at the Portersville office on July 9, 2009. *Id.* at ¶¶ 22-23). With respect to this incident, the APWU filed a grievance and Plaintiff was awarded two hours of overtime pay for the violation of a contractual agreement regarding bargaining unit work. (Docket No. 36, at ¶ 16; Docket No. 39-5, at 2; Docket No. 42, at ¶ 16).

In light of the record, there is sufficient evidence to infer a causal link between Plaintiff's filing of the EEO complaint and the subsequent termination decision. *Kachmar*, 109 F.3d at 178 (at the *prima facie* stage, a plaintiff need only "provide[ ] an evidentiary basis from which an inference [of retaliation] can be drawn"). Although there is not an "unusually suggestive temporal proximity" given the two or three-month gap between the participation in the protected activity and the materially adverse action, *Leboon*, 503 F.3d at 233, there was a constant and consistent pattern of antagonism in the intervening time frame sufficient to raise an inference of causation. *Farrell*, 206 F.3d at 281 (citing *Kachmar*, 109 F.3d at 177). The rapid deterioration in relations between the two began during or shortly after the EEO dispute resolution process and never improved. Rather, the initial bickering led to cuts in hours at Plaintiff's home office in

Portersville, which then progressed to the issuance of a termination decision within months. Accordingly, Plaintiff has met her burden of production to set forth sufficient facts regarding her *prima facie* claim of retaliation for summary judgment purposes.

## B. Defendant's Legitimate, Non-Discriminatory Reason for the Termination Decision

Because Plaintiff has established her *prima facie* claim of retaliation, the burden of production shifts to Defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged action was taken for legitimate, non-discriminatory reasons. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-255 (1981). To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," because "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original). The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, "*if taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (emphasis in original). As the Third Circuit has observed, the employer's burden at this stage is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Defendant contends that there was a legitimate, non-discriminatory reason to terminate her on the basis of Plaintiff's willful disruption of the mail. (Docket No. 35, at 10). The incident that directly triggered the termination decision occurred on September 7, 2009, Labor Day. (Docket No. 1, at ¶¶ 24-28). She was scheduled to work two hours on that day to break down the

mail. (Docket No. 36, at ¶ 24; Docket No. 43-1, at ¶ 12). After working her two-hour shift, she removed labels she had previously made from the mail bins. (Docket No. 43-1, at ¶¶ 14, 16).

A disciplinary request for removal was issued by Ms. Kelly regarding Plaintiff's conduct on September 7, 2009, Labor Day, wherein it was charged that Plaintiff's willful actions caused a severe disruption in the delivery of the mail. (Docket No. 39-10, at 4-5). Specifically, Ms. Kelly complained that "a whole cage of parcels [was] not sorted and the labels [were] removed from the label case." *Id.* at 4. As a result, "box selection up time was delayed by several hours and not completed until 1:30 PM" and "carriers were unable to leave the office to deliver their assigned routes until 12:00 Noon." *Id.* at 2, 8. The Notice of Removal sent to Plaintiff cited two violations of the postal rules listed in the Employee & Labor Relations Manual, namely, § 665.13 dealing with discharge of duties as well as § 665.16 concerning the behavior and personal habits of employees. *Id.* at 3. Even Plaintiff accepts that the willful delay of mail would be a terminable offense. (Docket No. 41, at 6). Moreover, poor work performance can also be a valid basis for termination. *See D'Alessandro v. City of Newark*, 454 F. App'x 53, 56 (3d Cir. 2011). Therefore, taking these facts as true, Defendant has adequately asserted a legitimate, non-discriminatory reason for terminating Plaintiff.

### C. Plaintiff's Evidence of Pretext

In order to overcome Defendant's proffered legitimate non-discriminatory reasons for its termination decision, the burden shifts to Plaintiff to prove by a preponderance of the evidence that such action was a pretext for discrimination. To meet this burden, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action." *Fuentes*, 32 F.3d at 764. The Third Circuit has explained how a plaintiff can discredit the employer's asserted legitimate, non-discriminatory reason:

> The plaintiff can discredit the proffered reasons by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." Alternatively, to show that discrimination was the likely cause of the adverse action, a plaintiff can show, for example, that the defendant had previously subjected the same plaintiff to "unlawful discriminatory treatment," that it had "treated other, similarly situated persons not of his protected class more favorably," or that it had "discriminated against other members of his protected class or other protected categories of persons."

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010) (quoting *Fuentes*, 32 F.3d at 764–65). However, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) (citations omitted). Given that the *prima facie* case and pretext inquiries often overlap, evidence supporting the *prima facie* case can be used to demonstrate pretext. *Id.* (citing *Farrell*, 206 F.3d at 286).

In light of the record as a whole and drawing all reasonable inference in Plaintiff's favor, the Court finds that insufficient evidence has been presented from which a trier of fact could conclude Defendant's explanation was pretextual. Plaintiff must present evidence tending to prove that she would not have been terminated if she had not participated in the protected activity. She has not shown that Defendant could and would have simply ignored her actions on September 7, 2009. Indeed, Plaintiff has conceded that the deliberate attempt to sabotage the

efficient operation of the Portersville Post Office warrants termination. (Docket No. 41, at 6).

Moreover, she admits she removed the labels from the mail bins that distinguish between the

various routes, (Docket No. 43-1, at ¶¶ 12-16), and she does not deny that she did not finish

breaking down the mail in her two-hour shift. (Docket No. 41, at 7). Thus, she does not contest

that she did in fact engage in the acts that formed the basis of the removal action. While she

denies being motivated to sabotage the mailing process, the wisdom of the termination decision

is not at issue in a retaliation claim and cannot be used to show pretext. *See Fuentes*, 32 F.3d at

765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show

that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent.") (citations omitted).

Plaintiff rests the bulk of her pretext argument on the history of troubled interactions

between her and Ms. Kelly. (Docket No. 41, at 6). Plaintiff contends that Ms. Kelly's lingering

retaliatory animus, which was manifested in the form of threats to eliminate her job and cut her

hours, was the real reason Ms. Kelly recommended her termination months following her initial

EEO complaint on June 15, 2009. *Id.* Thus, she argues that Defendant's asserted justification

for the termination decision on the basis of her willful disruption of the mail is merely a pretext.

*Id.* However, such evidence does not, by itself, shed much light on whether the proffered reason

for her termination was *genuine*. Even if Ms. Kelly possessed retaliatory animus, she would not

be precluded from disciplining Plaintiff for committing a real infraction warranting severe

disciplinary action such as termination. *See Fuentes*, 32 F.3d at 764 (showing of pretext must

adequately demonstrate that "an invidious discriminatory reason was more likely than not a

*motivating or determinative cause* of the employer's action") (emphasis added).

Based on the evidence presented in the record, no reasonable jury would believe that Ms. Kelly's purported retaliatory animus stemming from her filing of the EEO complaint was the "motivating or determinative cause" for the termination decision or otherwise "disbelieve the employer's articulated legitimate reasons." *Id.* Plaintiff has produced evidence showing that she believed September 7, 2009 was to be her last day at the Portersville Post Office. (Docket No. 39-1, at 20; Docket No. 43-1, at ¶ 13). As Plaintiff explains, she had made and affixed sorting labels on the mail bins to help her distinguish between the various mail routes. (Docket No. 43-1, at ¶ 14). Because each clerk used different methods to sort their mail, she removed her labels under the assumption that her replacement would wish to implement his or her own sorting system. (Docket No. 43-1, at ¶¶ 15, 17).

Defendant has presented evidence detailing the investigatory measures taken by Ms. Kelly and documenting the decision-making process that resulted in the issuance of the Notice of Removal. As Ms. Kelly recounts in her declaration, she confronted Plaintiff about her actions, whereupon Plaintiff told Ms. Kelly that she removed the labels because she had made them. (Docket No. 39-6, at ¶ 12). Ms. Kelly also asserts that Plaintiff explained she did not finish breaking down the mail because she was no longer familiar with the Portersville distribution scheme.[3] *Id.* A Pre-Disciplinary Interview was held on September 15, 2009,[4] with Plaintiff, Ms. Kelly, Mr. Scherder, and union steward Richard Riggs in attendance. (Docket No. 39-10, at 8). During this interview, Plaintiff was again questioned about why she was unable to finish breaking down the mail and asked to elaborate on why her removal of the labels on the sorting case did not constitute willful action to delay delivery of the mail. *Id.* The Pre-Disciplinary Interview Form indicates that Plaintiff merely responded by stating that she had not been

_____

[3] This same account of Plaintiff's response was given in the Notice of Removal. (Docket No. 39-10, at 2).
[4] Ms. Kelly's discipline request form suggests that this Pre-Disciplinary Interview may have occurred on September 17, 2009. (Docket No. 39-10, at 4).

working with the Portersville distribution scheme for two years and reiterating that "[t]hey were my labels I made them at home. Labels are NOT hard to make." *Id.* Significantly, Plaintiff has not supplemented the record with an affidavit or other evidence showing that she provided a fuller justification for her actions during these informal and formal discussions about the incident.[5] Moreover, it is undisputed that Plaintiff had been distributing and sorting mail at Portersville since March 2008. (Docket No. 36, at ¶ 26; Docket No. 42, at ¶ 26). As of September 7, 2009, she had last performed clerical functions at Portersville, including breaking down the mail for distribution on August 29, 2009. (Docket No. 36, at ¶ 26; Docket No. 42, at ¶ 26). In light of Defendant's evidence, which has not been met with countervailing evidence, there is simply no basis for a factfinder to reasonably believe that Ms. Kelly was motivated by retaliatory animus when requesting Plaintiff's removal.

Although Plaintiff maintains that "Defendant has not set forth specific evidence to show substantial disruption in the delivery of mail," (Docket No. 41, at 7), she has not provided any evidence demonstrating that there was no substantial disruption of mail. To the contrary, she has specifically denied having "knowledge as to any effect on the delivery of the mail." (Docket No. 42, at ¶ 24). However, Defendant has set forth sufficient evidence showing there was a substantial disruption in the mail to require Plaintiff as the nonmovant in a summary judgment motion to respond with evidence demonstrating that there remains a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 324. Specifically, Defendant has introduced Ms. Kelly's declaration that Plaintiff's actions resulted in a "substantial delay in processing and delivering

---

[5] Specifically, Plaintiff explains that the two hours she was given to break down the mail was not sufficient to complete the job. (Docket No. 39-4, at 5; Docket No. 41, at 7). In fact, Plaintiff noted that an email had been circulated advising about increased mail volume for the Labor Day holiday. (Docket No. 39-4, at 5). Nothing in the record indicates that this particular explanation was given to Ms. Kelly prior to the removal decision. Plaintiff further asserts that she removed her personal labels on her last day of work based on the fact that the labels were not present pursuant to office policy, but only as a result of her personal sorting method. (Docket No. 41, at 7). The Pre-Disciplinary Interview Form only indicates that Plaintiff told Ms. Kelly that the labels were hers and that labels were not hard to make. (Docket No. 39-10, at 8).

the mail" the following work day, (Docket No. 39-6, at ¶ 5), as well as the agreement of USPS supervisor Daniel Devey as to Plaintiff's removal based on the attached Pre-Disciplinary Interview Form, which included references to the fact that the mail carriers did not begin delivery until noon and that the "box section" was not finished until 1:30 p.m. (Docket No. 39-10, at 4-8). Plaintiff cannot simply rely on her disbelief of the proffered evidence, but must instead come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Meditz v. City of Newark*, 658 F.3d 364, 369 (3d Cir. 2011) ("'Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor.'") (quoting *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010)).

Defendant has also submitted evidence that counters Plaintiff's attempt to characterize Ms. Kelly's behavior as one that was motivated by retaliatory animus. First, Defendant disputes that Ms. Kelly learned of the EEO complaint until early July 2009. (Docket No. 35, at 4; Docket No. 39-6, at ¶ 9). There is no evidence that Ms. Kelly was even aware of the EEO complaint on June 30, 2009, the date Plaintiff alleges Ms. Kelly said her job was to be eliminated. The event description for the EEO complaint only supports the conclusion that she knew of the complaint by July 10, 2009 at the latest, the date when she participated in a mediation relating to this charge. (Docket No. 39-3, at 4). In response, Plaintiff merely reasserts her belief that Ms. Kelly's threat was issued in retaliation to her filing the EEO complaint, implying that Ms. Kelly knew about the EEO complaint by June 30, 2009. (Docket No. 43-1, at ¶¶ 3-4). This mere reassertion of unsupported factual allegations is not sufficient for summary judgment purposes,

*see Williams*, 891 F.2d at 460, and therefore cannot be used to establish a dispute of material fact as to whether there was retaliatory animus on June 30, 2009.

Defendant further argues that Ms. Kelly never specifically threatened to fire Plaintiff or eliminate her position. (Docket No. 35, at 5; Docket No. 39-6, at ¶ 7). Rather, Defendant asserts that Ms. Kelly was instituting scheduling changes based on her perception that the work load at the Portersville Post Office was not sufficient under normal circumstances to require the scheduling of a PTF clerk other than when the Postmaster or OIC was not present. (Docket No. 35, at 5; Docket No. 39-6, at ¶ 6). As early as May 2009, Ms. Kelly recounts that she informed Plaintiff that she was recommending a reduction in her scheduled hours at Portersville on that basis. *Id.* Indeed, it has not been contested that USPS supervisors approved shortened operating hours at the Portersville Post Office. (Docket No. 39-6, at ¶ 7). Moreover, it is undisputed that Ms. Kelly assured Plaintiff that she would attempt to make up for the reduction for her hours at Portersville by getting her hours at neighboring post offices. (Docket No. 36, at ¶ 19; Docket No. 39-1, at 14; Docket No. 42, at ¶¶ 19).

These proposed scheduling changes were cleared by Don Snyder, Manager of Postal Operations, before they were initiated in the summer of 2009. (Docket No. 39-6, at ¶ 7). The operating hours of the Portersville Post Office were then shortened by one hour for each weekday. *Id.* In addition, the current Postmaster of Portersville has affirmed that Plaintiff was the last PTF clerk to work at the Portersville Post Office. (Docket No. 39-13, at ¶ 5). To date, the Portersville Post Office does not employ a PTF clerk, but rather has a Postal Support Employee to handle the Postmaster's duties when he is on leave. *Id.* at ¶¶ 4, 6.

Additionally, Plaintiff has conceded that she was able to supplement her hours at other post offices. (Docket No. 42, at ¶ 2; Docket No. 43-1, at ¶ 24). When she was asked to compare

her hours before and after the alleged retaliation, she agreed that her hours remained "pretty consistent." (Docket No. 39-1, at 15). The record confirms that she maintained steady hours from August and September by working in various Post Offices in the region. (Docket No. 39-8, at 2-3). Moreover, calendar records maintained by the Portersville Post Office indicate that Plaintiff worked there on August 22, 2009 as well as on August 24, 2009 through August 27, 2009. *Id.* at 2. However, Plaintiff continues to insist that her more desirable hours at her home office in Portersville were reduced. (Docket No. 43-1, at ¶¶ 23-24).

Defendant points out that some of the reduction of Plaintiff's hours at the Portersville Post Office was attributable to her decision to "no longer accept higher level work as of 08/22/2009" and that she would only "accept level 07 pay." (Docket No. 35, at 6; Docket No. 39-7, at 2). As Labor Relations Specialist Denise Johnson declares, Postal management took the position that the person filling in for the Postmaster or OIC had to be a POA in a management position. (Docket No. 39-14, at ¶ 8). Postal management apparently did not want a level seven clerk as the authority in the office, and it was the practice of the Postmaster to seek another individual who would accept the higher POA level pay. *Id.* This was not an isolated occurrence, as there were numerous instances when Postmasters would schedule other employees in lieu of craft employees such as Plaintiff who refused to accept higher level POA pay. *Id.* Ms. Kelly acted in this manner and Plaintiff was no longer scheduled for POA duty at Portersville. (Docket No. 39-6, at ¶ 10). In response, Plaintiff generally disputes that Ms. Kelly was motivated by the Postal management's direction rather than retaliatory animus. (Docket No. 36, at ¶ 23; Docket No. 42, at ¶ 23). However, without evidence showing that Postal management would have condoned keeping Plaintiff as a POA while paying only level seven pay, such an unsupported

assertion again fails to properly preserve a triable issue of fact as to whether this decision constitutes an instance of retaliatory antagonism.

Finally, Plaintiff has not demonstrated that "similarly situated employees were not treated equally." *Burdine*, 450 U.S. at 258-59. In Plaintiff's December 10, 2009 EEO Complaint, she protested that the termination decision was not warranted given that other employees who were responsible for delay or destruction of mail were not similarly disciplined or terminated. (Docket No. 39-4, at 7). She specifically references two incidents involving Ms. Strawhecker that did not result in a disciplinary action: (1) on around January 16, 2009, Ms. Strawhecker reported to work with a tray of mail that she was unable to finish delivering the day before; and (2) on around May 26, 2009, Ms. Strawhecker received a complaint from a customer that accused her of leaving a shipment of live trees on a vacant porch that subsequently died. *Id.* In both instances, Ms. Kelly either ignored the delay or destruction of mail or directed Plaintiff not to confront the carriers about their work issues. *Id.* However, Ms. Strawhecker's mail delivery problems appear the result of negligence or inadvertence rather than the kind of intentional misconduct that formed the asserted basis for the termination decision at issue. Thus, she cannot establish that she was a similarly-situated employee subject to differential treatment based on these imperfect comparisons.

In addition, the record reveals that Plaintiff was not the only employee who experienced difficulties with Ms. Kelly. Both Ms. Strawhecker and Ms. Grant have reported difficulties working for Ms. Kelly at the Portersville Post Office. Indeed, Ms. Strawhecker stated that Ms. Kelly's arrival at the Portersville Post Office was accompanied by friction between her and the rest of the staff. (Docket No. 43-4, at 2). She further recalled that Ms. Kelly "picked at everything I did" and described her as a "bully" who "likes to intimidate someone all the time."

*Id.* at 3.  Ms. Strawhecker also added that Ms. Kelly "was very intent on becoming a postmaster, and felt she had to tell any of us how to do everything."  *Id.*  Ms. Grant also stated that she and Ms. Kelly "had our difficulties" and that she "was a hard person to work for."  (Docket No. 43-2, at 3).  Although Mr. Flinner did not mention suffering from any personal mistreatment at Ms. Kelly's hands, he did observe that "she … used her authority too much; above and beyond."  (Docket No. 43-3, at 2).  Given that Ms. Kelly's management style was characteristically confrontational and "often domineering," (Docket No. 43-4, at 2), regardless of the particular employee, Plaintiff has not shown that she was singled out for retaliatory treatment.

In summation, Defendant has produced evidence showing that Plaintiff's actions on September 9, 2009 disrupted the delivery of mail and was an offense for which termination was warranted.  Plaintiff has not shown that either the USPS or Ms. Kelly could have simply ignored these actions.  There is no evidence that Plaintiff provided any meaningful exculpatory explanation to Ms. Kelly when asked about why she did not finish breaking down the mail and removed the labels from the mail bins during the initial questioning or at the Pre-Disciplinary Interview.  Thus, Plaintiff fails to establish that her participation in the protected activity was the "motivating or determinative cause" for the termination decision.  *Fuentes*, 32 F.3d at 764.  In addition, Plaintiff has not provided evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason.  *Id.*  Plaintiff has not shown that she was treated differently than similarly-situated employees.  Considering the unflattering comments of Plaintiff's co-workers regarding their treatment at Ms. Kelly's hands, her abrasive management style was not reserved solely for Plaintiff.  Moreover, the cuts in Plaintiff's hours at the Portersville Post Office resulted from the shortening of operating hours and from her refusal to accept high level pay for POA work.  While Plaintiff generally disputes that these facts show Ms.

Kelly was motivated by anything other than retaliatory animus, she has not supported her objections with facts of her own. By doing nothing more than simply expressing "some metaphysical doubt" as to Ms. Kelly's true reason for recommending her termination, Plaintiff has not met her summary judgment burden of showing that there is a genuine issue as to these disputed material facts. *Matsushita*, 475 U.S. at 586. Accordingly, she has not shown that the legitimate, non-discriminatory reason offered by Defendant was pretextual.

## IV. CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment [34] is GRANTED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:        March 19, 2013
cc/ecf:      All Counsel of Record